UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

GILBERT T. GLEGHORN,           )
                               )
            Plaintiff,         )
                               )
      vs.                      )      Case No. 4:14-CV-426-CEJ
                               )
CAROLYN W. COLVIN, Acting      )
Commissioner of Social Security, )
                               )
            Defendant.         )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I.      Procedural History

On March 11, 2008, plaintiff Gilbert T. Gleghorn filed an application for supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of December 3, 2007.  (Tr. 287–89)  After plaintiff's application was denied on initial consideration (Tr. 152–57), he requested a hearing from an Administrative Law Judge (ALJ).  (Tr. 159–61)  Plaintiff and counsel appeared for a hearing on January 6, 2010.  (Tr. 36–78)  The ALJ issued a decision denying plaintiff's application on March 26, 2010.  (Tr. 129–44)  Plaintiff requested the Appeals Council reverse the ALJ's decision and remand for a new hearing (Tr. 203), which request was granted on December 12, 2011.  (Tr. 145–49)  Plaintiff also filed a subsequent claim for Title XVI benefits on March 22, 2011, which was consolidated with his prior claim.  (Tr. 10)  The ALJ held a second hearing on May 10, 2012, at which plaintiff and counsel again appeared.  (Tr. 79–125)  On October 12, 2012, the ALJ issued a second decision denying plaintiff's application.  (Tr. 7–

27)   The Appeals Council denied plaintiff's request for review on January 6, 2014. (Tr. 1–3)   Accordingly, the ALJ's second decision stands as the Commissioner's final decision.

## II.   Evidence Before the ALJ

### A.   Disability Application Documents

In his Disability Report (Tr. 394–401), plaintiff listed his disabling conditions as arthritis in his left foot and flat feet.  (Tr. 395)  He has difficulty standing for long periods and carrying weighted items.  *Id.*  He takes over-the-counter Advil, Aspirin, Ibuprofen, and Tylenol for pain.  (Tr. 399)  Plaintiff stated that he attended special education classes through the equivalent of the tenth grade, but the Missouri Special School District has no record of plaintiff's attendance.  (Tr. 400, 464)   In the report, plaintiff states that he can read and understand English and that he can write more than his name in English.  (Tr. 394)

In a Missouri Supplemental Questionnaire completed on March 15, 2008 (Tr. 370–77), plaintiff complained of additional arthritis pain in his left hip, and that one of his legs is larger than the other.  He also reported difficulty following written and verbal instructions, and that he cannot read or write.   Plaintiff reported taking prescription Tramadol[1] as needed and using a self-prescribed cane every day. Conflictingly, plaintiff stated both that he does not shop and that he goes shopping once a week.  (Tr. 373, 375)  Plaintiff reported doing "nothing" throughout the day, suffering constant pain.  (Tr. 374)  He alleged that sitting for a long period causes pain, but that he can watch a thirty minute television show.  *Id.*

---

[1]**Error! Main Document Only.**Tramadol is prescribed for treatment of moderate to moderately severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html (last visited Jan. 23, 2015).

On March 21, 2008, plaintiff completed a second Missouri Supplemental Questionnaire. (Tr. 378–85) He reported sometimes having difficulty understanding what people are saying to him. (Tr. 384) His arthritis symptoms are exacerbated by walking, standing, and lying or sitting on his left side for too long. (Tr. 378) His inability to lie on his left side without pain makes sleeping difficult. (Tr. 382) Plaintiff reported that his daily dose of Tramadol, coupled with over-the-counter Advil and Tylenol, caused sleepiness and drowsiness. (Tr. 379) Inconsistently, plaintiff stated that he does not ever go shopping (Tr. 381) and that he drives to the "store and back," "when needed." (Tr. 383) He reported doing no household chores (Tr. 381), and yet he said that sometimes he must be reminded to complete chores. (Tr. 384) He spends most of his day "taking something for pain every three or four hours." (Tr. 382) He is unable to sit for long without shifting from side to side. *Id.* In contrast to the questionnaire he completed a week earlier, plaintiff reported that his pain is so severe that he cannot even watch a 30-minute television show. *Id.*

On March 23, 2008, plaintiff completed a Work History Report in which he detailed past jobs as a cook, a dishwasher, a mover, and a landscaper. (Tr. 386) He could not remember when he had worked at any of those jobs, but he recalled that he last worked on January 1, 1993. (Tr. 386, 395) He reported that some of his prior work included the use of machines, tools, and equipment; and technical knowledge and skills. (Tr. 387, 389, 391)

In a Function Report filed on July 3, 2009, plaintiff stated that he spends his days sitting or lying down and watching television. (Tr. 433) His sleep is disrupted because he must hang his left foot off the bed "for blood flo[w]." (Tr. 434) He

leaves his house about every other day, at which times he drives his car, sometimes rides in a car driven by others, or uses public transit. (Tr. 436) In the Function Report, he claimed that he never goes shopping. *Id.* He reported that his alleged conditions do not affect his ability to follow verbal instructions, use his hands, see, hear, talk, or get along with others. (Tr. 431) In the Function Report, plaintiff stated that he ambulates with a cane only "some times." (Tr. 432)

## B.  Testimony at the First Hearing

Plaintiff was 49 years old at the time of the first hearing before the ALJ. (Tr. 41) He testified that he has limited reading and writing skills. (Tr. 43, 70) He had been incarcerated several times for crimes he could not always detail, most recently for two years for possession of a controlled substance. (Tr. 46–47)

Plaintiff recalled that he has not worked in over twenty years. (Tr. 51) The ALJ noted, however, that medical records from 2003 captured plaintiff's statement that he "had his own lawn service." (Tr. 52) Plaintiff did not explain that discrepancy. (Tr. 53) He claimed that he does not do any household chores, but admitted to going shopping with his wife. (Tr. 66) He also testified that he sometimes visits his cousin and his daughters in their homes. (Tr. 67)

Other than his left leg and hip, plaintiff testified that he has no problems with his arms, hands, or any other body part that would interfere with his ability to work. (Tr. 70) In his estimation, he can walk for just three to five minutes at a time. (Tr. 67) He also estimated that he could only stand for five minutes at a time, and that he could sit for ten or twenty minutes, during which time he would have to shift from side to side. (Tr. 67–68) In response to questions from his counsel, plaintiff testified that he elevates his left leg at night with a pillow and that

he sleeps for four hours a night, tossing and turning throughout.  (Tr. 68–69)  He does not lie on his left side when in bed because of his left foot and left hip condition.  (Tr. 69)  Because his left foot "swells up," plaintiff elevates it "throughout the day[,] three or four times a day."  (Tr. 68)  Plaintiff testified that, he would have typically "been up 20 times" and have elevated his foot in the amount of time the hearing lasted.  (Tr. 70)  The ALJ told plaintiff that he could change his body position or stand up, but plaintiff did not do so.  (Tr. 39)

Despite plaintiff's claim that he uses a cane every day to ambulate, the ALJ took note that plaintiff did not appear at the hearing with a cane.  (Tr. 54)  The ALJ also observed that plaintiff was not limping when he walked into the hearing.  (Tr. 57)  Plaintiff then admitted that he uses a cane only "every now and then," or about once a week, when his foot swells up.  (Tr. 54, 58, 68)  The ALJ also noted that plaintiff was observed at one point using a cane on "the wrong side for an injury to [his] left foot."  (Tr. 58)

At the time of the first hearing, plaintiff had not been prescribed any medication for his arthritis; instead, he took only over-the-counter Advil and Tylenol.  (Tr. 55, 58, 62)  He recalled that his podiatrist had once prescribed unspecified pain medication, but it did not alleviate his symptoms.  (Tr. 62)  He also reported receiving indeterminate treatment for his breathing.  *Id.*  He was "on the borderline for diabetes," but his physician did not prescribe any medication for this condition*. Id.*

Plaintiff completed a mandatory drug rehabilitation program upon his release from prison in 2005, and he maintains that he has not used any drugs since he was released.  (Tr. 61–63)  When questioned by the ALJ about his putative substance

dependency disorder, however, plaintiff admitted that he drinks alcohol with such regularity and in such quantities that his drinking is an "actual disorder," and that he abuses alcohol.  (Tr. 55)  Plaintiff testified that he drinks alcohol "when [he] get[s] his hands on it," and that he will drink as much alcohol as he has available. (Tr. 56)

### C.  Testimony at the Second Hearing

Following the Appeals Council's remand order, the ALJ conducted a second hearing on May 10, 2012, which plaintiff and counsel attended.  (Tr. 79–125) Plaintiff weighed 250 pounds and he was 5′ 5″ tall.  (Tr. 89)  He testified that it is difficult for him to write, such that he would be unable to write out a sentence without assistance.  (Tr. 86)  Plaintiff also reported that his memory is "very shot," and that he has trouble remembering things "all the time."  (Tr. 89–90)

In addition to arthritis pain, plaintiff complained of migraines, which he gets "maybe once [or] twice a month."  (Tr. 87–88, 90)  He estimated that he can stand in one place for about twenty to thirty minutes.  (Tr. 87)  He reported being unable to sit in one position for very long, but said that he can stretch his left leg and foot out to "let [his] blood circulate."  *Id.*  He estimated that he can only walk one-half of a block before needing to rest.  (Tr. 90)

Plaintiff testified that he spends most of the day "[j]ust sitting with [his] leg propped up, watching TV."  (Tr. 88)  He reported propping his left leg up for four to five hours every day because it "helps [his] blood circulate better."  *Id.*  Contrary to his statement at the first hearing that he uses a cane infrequently, plaintiff testified that he walks with a cane to take pressure off his left foot "basically every day" for "maybe 10 [to] 15 minutes" per day.  (Tr. 89)

Plaintiff reported taking over-the-counter medications, including Advil, Bayer, and Tylenol, to alleviate his pain "all the time." (Tr. 86, 90) He also recalled taking prescription Tramadol for the pain in his left foot and for migraines. (Tr. 87) But the medications provide only temporary relief. (Tr. 90)

Anthony Francis, M.D., testified at the second hearing. After reviewing plaintiff's medical records, he opined that plaintiff had a calcaneal fracture (a heel bone fracture on the left side), which demonstrated subtalar arthritis (arthritis below the talus in the middle portion of the foot and between the calcaneus and the talus). (Tr. 94–95) Although plaintiff refused a subtalar and talonavicular fusion procedure on his left ankle, Dr. Francis explained that surgery of that type is merely a "salvage procedure" that might not alleviate plaintiff's impairment. (Tr. 95) Dr. Francis also offered the non-medical opinion that "on a more likely than not basis [plaintiff's condition] would equal [listing] 1.02A." (Tr. 98–99) Plaintiff had a laparoscopic procedure to remove his gallbladder, without lingering side effects, and his obesity is one factor relevant to his ability to work, according to Dr. Francis. (Tr. 95–96)

Dr. Francis also opined on inconsistencies in the medical evidence presented to him. A physical residual functional capacity assessment from August 26, 2011 records that plaintiff has osteoarthritis of the left hip, which may not have been present, and fails to note osteoarthritis of the left foot. (Tr. 96, 717–23) Moreover, according to Dr. Francis, the August 26, 2011 assessment was erroneous in part because it states that plaintiff could stand or walk for six hours out of an eight hour workday, which is inconsistent with "most subtalar and talonavicular arthritis." (Tr. 96)

To the contrary, Dr. Francis opined that plaintiff might be limited to two hours of standing per day, perhaps less. (Tr. 99) In response to the ALJ's questions, Dr. Francis explained that no medical evidence supports the conclusion that plaintiff would be limited to walking no more than three minutes at a time, standing no more than five minutes at a time, or sitting no more than ten or twenty minutes at a time. (Tr. 102–03) Dr. Francis maintained that plaintiff's ability to sit would be "unlimited" with "normal work breaks." (Tr. 98–100) While Dr. Francis believed that someone with plaintiff's arthritic condition might have to elevate his leg "at times" during a workday, whether such a person would have to elevate his leg for "three to four hours" would "depend on the individual." (Tr. 101)

Consulting expert Dr. James Reid, a clinical psychologist, testified regarding plaintiff's alleged mental impairments. (Tr. 105–15) Dr. Reid opined that plaintiff has an "organic mental disorder, specifically borderline intellectual functioning and substance addiction disorders." (Tr. 106) That diagnosis was consistent with plaintiff's Stanford-Binet test results, which evidenced a full scale IQ score of 72, according to Dr. Reid. (Tr. 106–07) Dr. Reid opined that a Wechsler Adult Intelligence Scale assessment that concluded plaintiff has a full scale IQ score of 54 was invalid because the Wechsler test results were not consistent with plaintiff having a valid driver's license or having previously worked for a lawn maintenance service. (Tr. 109) Moreover, Dr. Reid noted that there is a nearly twenty point discrepancy between plaintiff's performance IQ of 55 on the Wechsler test and the measure of similar functions evidenced by a nonverbal IQ of 74 on the Stanford-Binet test. (Tr. 111) In Dr. Reid's assessment, the failure to note an Axis I

diagnosis when performing the Wechsler test undercuts the credibility of those results. (Tr. 114–15)

As Dr. Reid explained, plaintiff's medical records confirm heavy, daily alcohol use, which would affect plaintiff's organic mental disorder, resulting in a "general diminution in all areas of cognitive functioning" for a period of six to nine months following a return to sobriety. (Tr. 107, 109) Evaluating plaintiff under listing 12.09 (organic mental disorders), Dr. Reid opined that plaintiff's activities of daily living are moderately impaired, his social functioning is markedly impaired, and his concentration, persistence, and pace is markedly impaired, with no evidence of repeated episodes of decompensation. (Tr. 108) In Dr. Reid's opinion, taking into account plaintiff's substance abuse disorder, his impairments would equal a listing. *Id.* However, Dr. Reid opined that with abstinence from drugs and alcohol for an extended period of time, plaintiff's activities of daily living would be only mildly impaired, his social functioning would be only mildly impaired, his concentration, persistence, and pace would be moderately impaired, and there would continue to be no episodes of decompensation. *Id.* Given plaintiff's limitations, he could be expected to be mildly impaired at completing simple, routine, repetitive tasks and moderately impaired at completing somewhat more complex tasks, according to Dr. Reid. *Id.*

Delores Gonzales, a vocational expert, provided testimony regarding the employment opportunities for an individual of plaintiff's age, education, and past relevant work who retains the residual functional capacity to perform light work but is limited in the following ways:

> [The individual] must have a sit/stand option with the ability to change positions frequently. This individual can climb stairs and ramps

occasionally, [but] never climb ropes, ladders, [or] scaffolds. This individual can stoop, kneel, crouch, [and] crawl occasionally. This individual is limited to pushing and pulling with the left leg to occasional. This individual must avoid even moderate exposure to extreme cold and vibrations. [The individual has the] [f]ollowing mental limitation[s:] [T]his individual can understand, remember, [and] carry out at least simple instructions, non-detailed tasks, demonstrate adequate judgment to make simple work-related decisions, adapt to routine simple work changes, [and] perform repetitive work according to set procedures, sequence, and pace.

(Tr. 117–19) When asked if she could identify any jobs that exist in the local, regional, or national economy for that hypothetical person, Gonzales identified mail sorter and hand presser. *Id.* The ALJ then changed the hypothetical to add the following mental limitations:

DAA [substance use disorder] is material. . . . [T]his individual could understand, remember, [and] carry out simple instruction on detailed tasks, however, would not be able to maintain concentration and attention for two-hour segments over a[n] eight-hour period, would not be able to respond appropriately to supervisors and co-workers in a task-oriented setting where contact is casual and infrequent, [and] will not be able to perform work at a normal pace even without production quotas.

(Tr. 119–20) Gonzales testified that such a person would not be able to perform any job that exists in significant numbers in the national or local economy. *Id.*

Plaintiff's counsel then asked Gonzales if her opinion that work is available for an individual as described in the ALJ's first hypothetical would change if the person had to reposition from sitting to standing and back as often as seven times an hour. (Tr. 121) Gonzales stated that such frequent changes in position could eventually decrease the individual's productivity or "become such a distraction that it would virtually eliminate" the individual's ability to work, but "depending on the job they were doing." *Id.* In addition, Gonzales testified that no unaccommodated jobs would exist for an individual who, per counsel's hypothetical, "needed breaks

every two hours for thirty minutes each to elevate their legs." *Id.* Moreover, such a person would not be able to work competitively if he was "simply off task, completely unproductive, at about 33[%] of the time." *Id.* If the person had to be retrained on the job at least every other day "because of memory or training issues," the person would also not be able to find employment. *Id.* While a person who cannot read or write might be unable to work as a mail sorter, Gonzales testified that such a person can still work as a hand presser. (Tr. 122)

### D. <u>Medical Records</u>

### 1. <u>Left Leg and Hip Impairments</u>

Plaintiff's medical records document his history of arthritis. On July 2, 2007, an x-ray of plaintiff's left leg revealed that his left knee is normal, while his left ankle and tarsus have enthesopathy. Another left leg x-ray on June 10, 2008 discovered "ossification adjacent to the talonavicular joint[,] which probably represent[s] [an] os supranaviculare." (Tr. 533) An x-ray of plaintiff's left hip, however, found no arthritis, acute fracture, dislocation, or soft tissue calcifications, only "mild nonuniform joint space narrowing." *Id.* Dr. David Kieffer examined yet another x-ray of plaintiff's left foot on November 30, 2007 and diagnosed plaintiff with "significant midfoot arthritis at [the] talonavicular, naviculocuneiform[,] and calcaneocuboid joints," with "[s]ignificant spurring on [the] dorsum." (Tr. 656) Dr. David Karges confirmed the diagnosis of "arthritis of the left subtalar and talonavicular joints" after examining plaintiff on December 29, 2009. (Tr. 813)

Additionally, in June 2007, plaintiff was treated for cellulitis of the right foot, which caused localized tenderness, redness, swelling, and affected his gait. (Tr. 502) He was advised to soak his foot in Epsom salts to decrease the swelling. *Id.*

That same month, when he visited the hospital because "he was down on the ground and his step-daughter and mother were jumping on him," plaintiff complained of experiencing "left knee pain and limping." (Tr. 608)

Plaintiff's medical records contain a number of reports of his symptoms. On May 2, 2007, Zachary Newland, D.P.M., treated plaintiff for complaints of gout in his left foot and an "old injury" to his right foot. (Tr. 503) Dr. Newland observed that plaintiff suffered from "generalized tenderness" and that he complained of "resultant weakness and pain on a regular basis." *Id.* During the examination plaintiff alleged that "he has been unable to maintain any jobs because [his] left leg [is] 'giving out on him always.'" *Id.* Dr. Newland reported that plaintiff had "noticeable decrease in [his left] leg girth and 1 grade muscle strength." *Id.* On August 1, 2007, plaintiff was seen by Shirley Marshall, M.D., because he experienced pain while walking, during which examination he reported that he was unable to fully extend his left knee, and that he had swelling and pain in his left knee and calf. (Tr. 497)

On May 6, 2008, Arjun Bhattacharya, M.D., examined plaintiff and detailed his reports of tenderness in his left ankle and foot, and his claims of weakness in the left leg and a limp.[2] (Tr. 517) Plaintiff claimed that he was able to walk about one block, stand for between 15 and 30 minutes, climb a flight of stairs, and bend but not squat. *Id.* Dr. Bhattacharya observed that plaintiff "walks with a cane that he bought himself." *Id.* Plaintiff "winced" at the slightest touch to his left hip, even though Dr. Bhattacharya observed no obvious deformity or evidence of inflammation in the hip. *Id.* He also "resist[ed] all movement of the foot and

[2]Plaintiff erroneously identifies Dr. Bhattacharya's examination records as the product of Saul Silvermintz, M.D.

12

toes[,] claiming that it causes severe discomfort." *Id.* Plaintiff reported being unable to walk without the cane; he had a marked limp, and he could not heel or toe walk. *Id.* Yet, he could "get on and off the examination table without any difficulty." *Id.*

Dr. Newland again examined plaintiff on August 20, 2009 and observed that he had "decreased size and girth" in his left leg, with an enlarged exterior digitorum brevis muscle on his left foot. (Tr. 594) In Dr. Newland's medical source statement of October 31, 2009, he reported that plaintiff can stand or walk for two hours continuously, without a break, that he can stand or walk for two hours throughout an eight-hour workday with usual breaks, and that he can lift or carry up to twenty pounds. (Tr. 653) When asked to opine regarding how long plaintiff can sit continuously without a break, Dr. Newland diagnosed: "No sitting limitations." *Id.* Yet, Dr. Newland reported that plaintiff will need to "elevate [his leg] 4 hours per 8 hour shift," "[d]ue to edema." (Tr. 654) Dr. Newland's medical source statement makes no mention of plaintiff's arthritis.

Dr. Newland sent a letter to plaintiff's counsel on November 3, 2009. (Tr. 651) In the letter, Dr. Newland reported that plaintiff has a "chronic" condition of pain and weakness in his left ankle, foot, and leg, with "noticeable decrease in girth of [plaintiff's] left musculature" and "only a (+) 1 muscle strength grade" in his left leg. (Tr. 651) Dr. Newland opined that plaintiff "is unable to maintain *desired* jobs due to weakness," and that plaintiff is "unable to stand on [his] left leg." *Id.* (emphasis added). The letter does not specify the medical cause or causes of plaintiff's alleged pain, and it does not mention arthritis.

Upon examination by Alan Morris, M.D., on August 15, 2011, plaintiff reported that he began using a cane in his left hand in 2009, which he uses "100% of the time." (Tr. 713) He reported being in constant pain that worsens when he stands and walks, and he said that he can sit for two hours at a time, stand for thirty minutes, walk for ten minutes, and lift perhaps ten pounds. *Id.* Plaintiff also reported to Dr. Morris that he never takes public transportation. *Id.* Dr. Morris observed that plaintiff has an "almost imperceptible limp on the left as he walks." (Tr. 713–14) Plaintiff's left calf was thirty-seven centimeters in diameter, while his right was four centimeters larger. (Tr. 714) Dr. Morris concluded that plaintiff suffers from left leg subtalar and mid-tarsal joint arthritis. *Id.*

The verisimilitude of plaintiff's allegations of constant disabling physical symptoms is called into question by the reports of many medical professionals. On February 2, 2008, Dr. Marshall examined plaintiff, the notes from which examination record that plaintiff had "normal posture." (Tr. 496) Likewise, the assessment of plaintiff's mental condition performed by Amy Marty, Ph.D., in May 2008 contains information about plaintiff's physical appearance, including notations that he suffered from no unusual motor activity and that his posture and gait were normal. (Tr. 526) Plaintiff was able to move all of his extremities with "good tone" when he was examined by Faqir Ahmad, M.D., on April 5, 2011. (Tr. 766) On December 19, 2011, Kimberly Perry, D.O., examined plaintiff and reported that his range of motion was normal in all of his extremities, that none of his extremities was tender to palpation, and that he had no edema. (Tr. 746) Ketal Patel, M.D., examined plaintiff in the emergency room on December 22, 2011 because he claimed to be suffering from headaches. (Tr. 728) During that examination, Dr.

Patel noted that plaintiff had a "normal[,] steady[,] stable gait" and he moved all of his extremities "equally with good tone."  (Tr. 728–29)  None of the aforementioned records note plaintiff using a cane to ambulate.

Plaintiff consistently reported taking over-the-counter medications to alleviate the pain from his arthritis and other conditions, including Advil, Aleve, Ibuprofen, and Tylenol.  (Tr. 446)  At various times over the last several years plaintiff was also prescribed medication to address his arthritis symptoms, including Hydrocodone/Apap[3] and Indomethacin.[4]  (Tr. 446, 503, 507, 818)  In May 2007, he was prescribed a 90-day regimen of Ultram.[5]  Medical professionals also prescribed or provided him with Amoxicillin[6] (for infections), Motrin, and Norvasc[7] (for hypertension).  (Tr. 608)  He was also prescribed Tramadol for his complaints of headaches.  (Tr. 496)  However, plaintiff's history of taking prescription medications for arthritis pain is sporadic—several of the medical records state that he was not taking any medications, prescription or otherwise.  (Tr. 539, 756).

---

[3]Hydrocodone/Apap refers to a combination of hydrocodone and Acetaminophen, *see* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010590/ (last visited Feb. 10, 2015), which is indicated for the relief of moderate to moderately severe pain.  *See Phys. Desk Ref.* 530–31, 3314–15 (60th ed. 2006).

[4]"Indomethacin is a nonsteroidal anti-inflammatory drug (NSAID) used to treat mild to moderate acute pain and relieve symptoms of arthritis."  *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0000945/ (last visited Feb. 11, 2015).

[5]**Error! Main Document Only.**Ultram is a centrally-acting synthetic opioid indicated for management of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of pain for extended periods of time.  *See Phys. Desk. Ref.* 2428–29 (63rd ed. 2009) (discussing extended release product).

[6]**Error! Main Document Only.**Amoxicillin is an antibiotic.  *See Phys. Desk Ref.* 1315–16 (60th ed. 2006).

[7]**Error! Main Document Only.**Norvasc is indicated for the treatment of hypertension and coronary artery disease.  *See Phys. Desk Ref.* 2546 (61st ed. 2007).

## 2. **Mental Impairments**

Although the Missouri Special School District has no record of plaintiff's attendance at any special education school (Tr. 464), plaintiff maintains—and the Commissioner does not contest—that he attended special education classes throughout his education. (Tr. 42, 69, 85, 382, 400, 478, 525, 527, 539) The school(s) he attended did not have delineated grade levels. (Tr. 42, 478, 525, 539) Plaintiff did not complete high school and he never obtained a GED. (Tr. 42) He gave contradictory reports to medical personnel about whether he can read and write. (Tr. 518, 525, 527, 539)

Two assessments of plaintiff's mental capacity were performed 73 days apart and yielded conflicting results. Dr. Marty performed an assessment of plaintiff on May 6, 2008. Her conclusions were based in part on inaccurate information. For example, during Dr. Marty's assessment, plaintiff "denied any history of or current alcohol use." (Tr. 526) Plaintiff also stated that he "does not drive, pay bills, cook, go grocery shopping, or complete household chores." (Tr. 527) However, he "appeared to understand instructions" and was observed "completing tasks to the best of his ability." *Id.* Plaintiff "evidenced the ability to maintain adequate attention and concentration with appropriate persistence and pace throughout the evaluation." (Tr. 528)

Dr. Marty performed a Wechsler Adult Intelligence Scale-III (WAIS-III) test, which yielded the following results: a verbal IQ score of 61, a performance score of 55, a full scale IQ score of 54, a verbal comprehension index score of 63, and a perceptual organizational index score of 56. (Tr. 527) Dr. Marty concluded, based on the WAIS-III test and plaintiff's self-reported activities, including his lack of

alcohol use, that plaintiff suffers from "mild mental retardation." *Id.* Dr. Kyle De Vore subsequently reviewed Dr. Marty's testing methods. (Tr. 554) Dr. De Vore noted that, although Dr. Marty considered her results "valid," she failed to "state if [the] results were consistent with adaptive functioning." *Id.*

In contrast, Alison Burner, a licensed psychologist, performed a Stanford-Binet 5th Edition test on plaintiff on July 18, 2008, which yielded a full scale IQ score of 72. (Tr. 539–40) The Stanford-Binet test returned the following other results: a nonverbal IQ of 74, a verbal IQ of 73, a fluid reasoning score of 82, a knowledge score of 79, a quantitative score of 72, a visual-spatial score of 71, and a working memory score of 80. (Tr. 540) Ms. Burner remarked that plaintiff's full scale IQ score of 72 "falls within the borderline range of intellectual functioning." (Tr. 540–41)

Ms. Burner's assessment was also based on a more forthright narrative of plaintiff's history of alcohol use. Plaintiff admitted to Ms. Burner that "alcohol was not his drug of choice but that he did abuse alcohol regularly." (Tr. 539) "He said that he continues to use alcohol and will get drunk every time he drinks if he can afford enough alcohol." *Id.* Plaintiff also reported that his "wife limits his access to alcohol and money and his old friends, to try to keep him straight and out of trouble." *Id.* According to plaintiff, "he typically drinks once a week[,] but . . . if he had money[,] he would likely 'blow it all on alcohol.'" *Id.*

Ultimately, Ms. Burner concluded that plaintiff shows "no evidence of a significant cognitive deficiency. His ability appears to fall within the [b]orderline range." (Tr. 542) Based on that diagnosis, Ms. Burner opined that plaintiff "would be able to follow simple directions without difficulty." *Id.* She also concluded that

plaintiff has "adequate social skills and should be able to obtain and maintain employment in line with is intellectual functioning." *Id.* Finally, plaintiff's "pace, performance, and stamina would be within normal limits in a job commensurate with his cognitive ability[,] as long as he remains clean and sober." *Id.*

### 3. **Substance Abuse Disorder**

Plaintiff's medical records counter his repeated assertions that he does not use alcohol or drugs at all (Tr. 518, 526), or that he uses alcohol only occasionally. (Tr. 478, 506)  On May 18, 2005, plaintiff's discharge summary from the Ozark Correctional Center remarks that he has two Axis I disorders: opioid abuse and alcohol abuse.  (Tr. 481)  When Ms. Burner examined plaintiff in July 2008, she reported that he "has a lengthy history of drug and alcohol addiction."  Plaintiff reported that he "abuse[s] alcohol regularly," and that if he had the money, he would  "blow it all on alcohol."  (Tr. 539-40)  Ms. Burner diagnosed plaintiff with opioid dependence, in remission, and alcohol dependence.  (Tr. 542)

Consistent with that diagnosis, records from a March 31, 2011 medical appointment with Drs. Vikram Patney and Muhammad Yasin memorialize plaintiff's history of "drinking quite heavily, almost on a daily basis."  (Tr. 755–56)  During that appointment, plaintiff admitted "to drinking a lot of alcohol," approximately a pint of Seagram's liquor per day, according to his wife.  *Id.*  So pronounced was plaintiff's alcohol abuse in March 2011 that doctors prescribed Librium[8] to minimize his withdrawal symptoms.  (Tr. 757)

---

[8]Librium is a brand name for Chlordiazepoxide, which is "used to relieve anxiety and to control agitation caused by alcohol withdrawal."  *See*
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682078.html. (last visited Feb. 12, 2015).

### E.  __The CDI Investigation__

The Social Security Administration's Cooperative Disability Investigations Unit (CDI) conducted an inquiry regarding plaintiff's claims, the report of which was issued on June 12, 2008.  (Tr. 410–22)  The CDI investigation uncovered a December 7, 2007 police report that identified plaintiff as a suspect in a burglary.  (Tr. 414)  According to that report, plaintiff "was seen by a city employee loading a refrigerator into the back of his pickup truck. . . ."  *Id.*  Plaintiff told the arresting officers that "he saw the refrigerator on its side in the driveway, so he took it. . . ."  *Id.*

The CDI investigators also surveilled plaintiff as he traveled from his residence to a medical appointment on June 10, 2008.  *Id.*  Plaintiff was observed walking with a limp on his left side and using a cane on his left side.  (Tr. 415)  Dr. Despine Coulis reviewed the surveillance footage and noted that plaintiff "walk[s] with a cane [held] in his left hand, implying that a unilateral lower extremity problem would be on the right side and not the left."  (Tr. 534)  Dr. Coulis observed that plaintiff walked "a distance of approximately 1/4 to 1/2 [a] mile each way" to his appointment and back.  *Id.*  "His stance appeared sturdy and straight while walking; his pace was normal; [and] he did not stop to rest."  *Id.*  Plaintiff descended nineteen steps without the use of a handrail.  (Tr. 415)  He stepped up directly onto a curb—he did not use an available curb cut.  *Id.*  Then, plaintiff walked up a ramp to a train platform.  *Id.*  When the train arrived, plaintiff "hurriedly entered the train just prior to the doors closing.  While hurrying, [plaintiff] did not utilize his cane . . . ."  *Id.*

### III.   The ALJ's Decision

In the decision issued on October 12, 2012, the ALJ made the following findings:

1.   Plaintiff has not engaged in substantial gainful activity since December 3, 2007, the application date.

2.   Plaintiff has the following severe impairments: healed left foot fracture; arthritis of the left ankle and foot; obesity; substance abuse disorder; organic mental disorder (borderline intellectual functioning). Plaintiff has the following non-severe impairments: status post cholecystectomy without residual effect; and hypertension controlled with medication compliance.

3.   Plaintiff's mental impairments, considering the effects of the substance abuse disorder, meet sections 12.02 and 12.09 of 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.   If plaintiff stopped the substance abuse, the remaining limitations would cause more than a minimal impact on plaintiff's ability to perform basic work activities.  Therefore, plaintiff would continue to have a severe impairment or combination of impairments.

5.   If plaintiff stopped the substance use, plaintiff would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

6.   If plaintiff stopped the substance abuse, plaintiff would have the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. § 416.967(b) except that plaintiff: must have a sit/stand option with the ability to change positions frequently; can climb stairs or ramps occasionally, but cannot climb ladders/ramps/scaffolds; can stoop, kneel, crouch and crawl occasionally; can push and/or pull using the left leg occasionally; needs to avoid even moderate exposure to vibrations and extreme cold; can understand, remember, and carry out at least simple instructions, non-detailed tasks; can demonstrate adequate judgment to make simple, work related decisions; can adapt to simple routine work changes; and can perform repetitive work according to set procedures, sequence, and pace.

7.   If plaintiff stopped the substance use, plaintiff would be unable to perform past relevant work.

8.   Plaintiff was born on September 28, 1960 and was 47 years old, which is defined as a younger individual age 18-49, on the date the

application was filed.  He was 50 years of age on the date the opinion was issued, an individual closely approaching advanced age.

9. Plaintiff has a limited education and is able to communicate in English.

10. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that plaintiff is "not disabled," whether or not plaintiff has transferable job skills.

11. If the claimant stopped the substance use, considering the claimant's age, education, work experience, and RFC, there would be a significant number of jobs in the national economy that plaintiff could perform.

12. The substance use disorder is a contributing factor material to the determination of disability because plaintiff would not be disabled if he stopped the substance use.  Because the substance use disorder is a contributing factor to the determination of disability, plaintiff has not been disabled within the meaning of the Social Security Act at any time from the date the application was filed through the date of the ALJ's decision.

(Tr. 10–27).

## IV.    Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)).  If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner.  *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. *See* 20 C.F.R. § 404.1520; *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." *Lacroix v. Barnhart*, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. *Pate-Fires*, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. *Id.*

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and

others, and an individual's own description of his limitations." *Moore*, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." *Buckner*, 646 F.3d at 558 (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" *Id.* (quoting *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000); *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. *Moore*, 572 F.3d at 523; *accord*

*Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006); *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001); *see also* 20 C.F.R. § 404.1520(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V.    Discussion

Plaintiff presents three questions for review: (1) whether the ALJ erred at step 3 in failing to find that plaintiff meets listing 1.02(A);  (2) whether the ALJ erred in finding that plaintiff's substance abuse was material to his disability; and (3) whether the ALJ erred in his RFC determination (a) by affording little weight to certain opinions of plaintiff's treating podiatrist, Dr. Newland; and (b) by failing to include all of the limitations allegedly endorsed by Dr. Francis.

## A. Listing 1.02(A)

Plaintiff alleges that the ALJ erred in failing to find that substantial evidence supports the conclusion that he meets or equals listing 1.02(A).  Listing 1.02(A) addresses major dysfunctions of the joints—including the weight-bearing joints of the hip, knee, or ankle—resulting in the inability to ambulate effectively.  20 C.F.R. § 404, Subpart P, App. 1, 1.02(A).  The inability to ambulate effectively is defined as an "extreme limitation of the ability to walk" so severe that the individual cannot ambulate "without the use of a hand-held assistive device(s) that limits the

functioning of *both* upper extremities." 20 C.F.R. § 404, Subpart P, App. 1, 1.00(B)(2)(b)(1),(2) (emphasis added). "Therefore examples of ineffective ambulation include . . . the inability to walk without the use of a walker, two crutches or two canes . . . ." *Id.*

"Although it is preferable that ALJs address a specific listing, failure to do so is not reversible error if the record supports the overall conclusion, as it does in this case." *Pepper ex rel. Gardner v. Barnhart*, 342 F.3d 853, 855 (8th Cir. 2003); *see also Moore ex rel. Moore v. Barnhart*, 413 F.3d 718, 721 n.3 (8th Cir. 2005). Though the ALJ's opinion does not discuss listing 1.02(A), the ALJ cited substantial evidence that plaintiff has, at most, used a single cane to ambulate, and not universally. No evidence in the record, moreover, supports the conclusion that plaintiff is or has ever been unable to walk without an assistive device that limits the function of both his upper extremities. So while the ALJ gave significant weight to Dr. Francis's opinion regarding certain medical issues, the ALJ need not have addressed Dr. Francis's erroneous legal conclusion that plaintiff meets the listing. Therefore, the ALJ did not err in failing to discuss listing 1.02(A) in his opinion because substantial evidence supports the conclusion that plaintiff does not meet that listing.

## B. <u>Substance Abuse Disorder</u>

Plaintiff contends that the ALJ erred in determining that substance abuse is a contributing factor to his severe mental impairments. "An individual is not considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." *Estes*, 275 F.3d at 724 (quoting 42 U.S.C. § 423(d)(2)(C)); *see also*

*Brueggemann v. Barnhart*, 348 F.3d 689, 693 (8th Cir. 2003). Drug addiction or alcoholism is material if the limitations that formed the basis of the Commissioner's disability determination would no longer be present if the claimant stopped using drugs or alcohol. 20 C.F.R. §§ 404.1535(b), 416.935(b).

The analysis requires the ALJ to first determine whether the claimant is disabled. *Viers v. Astrue*, 582 F. Supp. 2d 1109, 1122 (N.D. Iowa 2008); *see* 20 C.F.R. §§ 404.935, 404.1535 ("*If we find that you are disabled* and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability." (emphasis added)). "The ALJ must reach this determination initially . . . using the five-step approach . . . without segregating out any effects that might be due to substance use disorders." *Brueggemann*, 348 F.3d at 694 (citation omitted). This determination must be based on "substantial evidence of [the claimant's] medical limitations without deductions for the assumed effects of substance use disorders." *Id.*

If the ALJ concludes that the individual would be disabled based upon all limitations, the ALJ must then consider whether drug addiction or alcoholism is "material" to the determination of disability. This requires a two-step analysis. *Rehder v. Apfel*, 205 F.3d 1056, 1060 (8th Cir. 2000). First, the ALJ should determine which of the claimant's physical and mental limitations would remain if the claimant refrained from substance use. *Id.* Then, the ALJ must determine whether the claimant's remaining limitations would be disabling. *Id.* If the claimant's remaining limitations would not be disabling, the claimant's alcoholism or drug addiction is a contributing factor material to a determination of disability and

benefits will be denied. *Id.* If the claimant would still be considered disabled due to his or her remaining limitations, the claimant is disabled and entitled to benefits. *Id.* The claimant carries the burden of proving that alcoholism or drug addiction is not a material factor to the finding of disability. *Estes*, 275 F.3d at 725 (citing *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000)).

Plaintiff challenges the ALJ's determination that his alcohol consumption was a contributing factor to his mental impairments on two grounds: First, plaintiff contends that there is "no objective evidence" that he has a substance abuse disorder. [Doc. #12, at 12] To the contrary, the record developed by the ALJ contains substantial evidence to support the ALJ's conclusion that plaintiff has the substance abuse disorder of alcohol addiction. While the ALJ found plaintiff's self-serving complaints of disabling symptoms not credible (Tr. 25), the ALJ need not have discounted plaintiff's admission at the hearing that he drinks alcohol frequently, as much as he has available. (Tr. 14, 16, 19, 55–56) Likewise, the ALJ did not err when he accorded great weight to Dr. Reid's opinion that the medical records confirm plaintiff's heavy, daily alcohol use. (Tr. 14–15, 17, 107, 109) The ALJ also appropriately took into account plaintiff's medical records evidencing a past diagnosis of substance abuse disorder for alcohol. (Tr. 19, 481) Ms. Burner's assessment that plaintiff has a lengthy history of alcohol dependence contributed to the ALJ's finding of substantial evidence as well. (Tr. 16, 539) Moreover, the ALJ properly credited plaintiff's admissions at medical appointments to, in short, "abusing alcohol regularly." (Tr. 16, 19, 755–57) Substantial evidence thus supports the ALJ's conclusion that plaintiff has a substance abuse disorder.

Second, plaintiff asserts that even if he has a substance abuse disorder, the ALJ failed to identify any evidence of a period of sobriety that would reveal his functional limits absent the substance abuse.  In other words, he contends that, because he regularly abuses alcohol, it is impossible to assess his mental impairments without substance use.  As defendant notes, however, plaintiff retains the burden to establish that he would have disabling mental impairments if substance abuse were not a contributing factor.  *Estes*, 275 F.3d at 725.

Moreover, the ALJ accorded great weight to Dr. Reid's opinion that, based on the medical evidence and his expertise, plaintiff's cognitive function could be expected to improve with six to nine months of sobriety, and that plaintiff would not have disabling cognitive impairments after such a period.  (Tr. 14, 17, 107–09)  The ALJ also extensively noted plaintiff's lack of mental health or medical issues following eight months of forced sobriety during a period of incarceration.  (Tr. 19, 481)  Plaintiff's conflicting IQ test results, only the higher of which was based on an accurate report of plaintiff's alcohol use, were also taken into account by the ALJ in making the materiality determination.  (Tr. 15–17, 106–09, 111, 114–15, 527, 539–40)  Plaintiff cites no evidence, in the record or otherwise, to counter to those findings.  Accordingly, the ALJ having found the substance use disorder material based on substantial evidence, he did not err.

## C. Residual Functional Capacity

According to plaintiff, the ALJ erred in his RFC determination (1) by failing to evaluate "all of the opinions of record" and (2) by failing to "include the actual limitations assessed by the opinions that were given weight to."  [Doc. #12 at 12]  The Commissioner devotes some effort to defending the ALJ's analysis of Dr. Reid's

opinion, which focused on plaintiff's mental impairments. In point of fact, however, plaintiff alleges error in the ALJ's RFC assessment only as it pertains to the statements of Drs. Newland and Francis, which concern plaintiff's physical impairments. *See id.* at 12–15. Accordingly, the ALJ having appropriately considered the opinions of all other sources, as plaintiff concedes, the Court's discussion below is confined to the ALJ's analysis of the opinions of Drs. Newland and Francis regarding plaintiff's physical condition.

A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration, and citations omitted). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." *Id.* (citation omitted). The ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001) (quoting *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000)). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." *Id.* Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946). "Because the social security disability hearing is non-adversarial, however, the ALJ's duty to develop the record exists independent of the claimant's burden in this case." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

## 1. **Dr. Newland's Opinion**

Dr. Newland was plaintiff's treating podiatrist. Generally, the Commission gives more weight to the opinion of a source who has examined a claimant than a source who has not. 20 C.F.R. § 419.927(c)(1). When the treating physician's opinion is supported by proper medical testing, and is not inconsistent with other substantial evidence in the record, the ALJ must give the opinion controlling weight. *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citing 20 C.F.R. § 404.1527(c)(2)). An examining physician's opinion, however, neither inherently or automatically has controlling weight and "does not obviate the need to evaluate the record as a whole." *Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014) (internal quotations and citations omitted).

"An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (alteration in original) (internal quotation omitted). Moreover, "[a]n ALJ is entitled to give less weight to the opinion of a treating doctor where the doctor's opinion is based largely on the plaintiff's subjective complaints rather than on objective medical evidence." *Rosa v. Astrue*, 708 F. Supp. 2d 941, 950 (E.D. Mo. 2010); *see also Davis v. Shalala*, 31 F.3d 753, 756 (8th Cir. 1994); *Loving v. Dep't Health & Human Serv.*, 16 F.3d 967, 971 (8th Cir. 1994). An ALJ may not substitute his own opinions for the opinions of medical professionals. *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990); *see also Pate-Fires*, 564 F.3d at 946–47 (ALJs may not "play doctor"). However, an ALJ "need not adopt the opinion of a

physician on the ultimate issue of a claimant's ability to engage in substantial gainful employment." *Qualls v. Apfel*, 158 F.3d 425, 428 (8th Cir. 1998) (internal quotations and citations omitted). Ultimately, the ALJ must "give good reasons" to explain the weight given the treating physician's opinion. 20 C.F.R. § 404.1527(c)(2). But, of course, an ALJ is not required to discuss in detail every item of evidence. *Morrison v. Apfel*, 146 F.3d 625, 628 (8th Cir. 1998).

Plaintiff asserts that the ALJ erred in giving very little weight to portions of Dr. Newland's opinion because the portions discounted were based on plaintiff's subjective reports, without objective or independent medical verification. Far from providing only conclusory reasons for discounting Dr. Newland's opinion, as plaintiff alleges, the ALJ's well-reasoned decision contains eight single-spaced pages of analysis concerning plaintiff's RFC, which includes extensive discussion of Dr. Newland's opinion and the ALJ's reasons for discounting it. (Tr. 18–25) Chiefly, the ALJ afforded little weight to Dr. Newland's opinion letter of November 3, 2009 because in it Dr. Newland speaks of plaintiff's inability to maintain "desired" jobs. (Tr. 21, 651) The ALJ did not err in according little weight to the letter because Dr. Newland opined only that plaintiff is unable to perform such jobs as he desires, which is not the standard for determining disability. (Tr. 21) Moreover, Dr. Newland's statement of support that plaintiff is disabled is outside his expertise; it is a question for the Commissioner. *See Qualls*, 158 F.3d at 428.

The ALJ also provided sufficient reasons to discount Dr. Newland's medical source statement. As the ALJ explained, Dr. Newland opined that plaintiff can stand or walk continuously, without a break, for as long as two hours in an eight-hour workday and sit continuously without any limitations. (Tr. 22, 653) Yet, Dr.

Newland went on to opine that plaintiff needs to lie down or recline to elevate his leg for up to four hours of an eight-hour workday, due to edema. (Tr. 22, 654) The ALJ noted that those statements are internally inconsistent and, therefore, the ALJ was entitled to, and ultimately did, accord them little weight. *Id.*; *Wildman*, 596 F.3d at 964. It was not error, moreover, for the ALJ to discount Dr. Newland's statement that plaintiff must lie down or recline to elevate his leg because Dr. Newland did not cite any medical basis for that statement; it appeared "to be based merely upon subjective report[s] from" plaintiff. (Tr. 22, 654); *Rosa*, 708 F. Supp. 2d at 950.

Finally, the ALJ's extensive discussion of plaintiff's physical conditions, as evidenced by the record as a whole, undercuts plaintiff's argument that the ALJ failed to provide good reasons for not giving Dr. Newland's opinion controlling weight. The ALJ explicitly stated that "the totality of the evidence does not fully support the degree of severity of subjective complaints and functional limitations alleged by" plaintiff. (Tr. 19) For example, the ALJ noted that plaintiff testified he elevates his leg three to four times per day, not three to four hours. (Tr. 18) The ALJ took into account several medical reports that showed plaintiff had no swelling, inflammation, or edema of the extremities, which undermines Dr. Newland's assessment that plaintiff must daily elevate his leg to manage that condition. (Tr. 20) Finally, the ALJ explained that plaintiff's credibility in reporting his conditions—to Dr. Newland, the ALJ, and to other sources—is undermined by his poor work history, his financial motivation to seek benefits, and his inconsistencies and exaggerations when describing his alleged symptoms. (Tr. 14–25); *see Lamp v. Astrue*, 531 F.3d 629, 632 (8th Cir. 2008); *O'Donnell v. Barnhart*, 318 F.3d 811,

818 (8th Cir. 2003); *Johnson*, 240 F.3d at 1148–49. Accordingly, the ALJ did not err in assessing Dr. Newland's opinions.

### 2. Dr. Francis's Opinion

Plaintiff contends that the ALJ erred in his RFC assessment because he did not include Dr. Francis's purported endorsement of plaintiff's claims that he must elevate his leg up to four hours per day and must use a cane to ambulate. While the ALJ gave significant weight to Dr. Francis's opinion, an "ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." *Martise*, 641 F.3d at 927. Here, the ALJ credited Dr. Francis's findings as to some of plaintiff's physical symptoms, but he was not required to accept Dr. Francis's opinion regarding every issue or question posed.

Moreover, as to the specific findings with which plaintiff takes issue, he mischaracterizes Dr. Francis's statements. While Dr. Francis believed that someone with plaintiff's arthritic condition might have to elevate his leg "at times" during a workday, whether such a person would have to elevate his leg for "three to four hours" would "depend on the individual." (Tr. 101) As discussed above, the ALJ articulated good reasons for concluding that plaintiff does not have to elevate his leg for three to four hours per day, which limitation was not even endorsed by Dr. Francis.

Although Dr. Francis opined that it would be normal for someone with plaintiff's arthritic condition to use a cane sometimes (Tr. 101), the ALJ also provided good reasons for concluding that plaintiff does not need a cane to ambulate. The ALJ noted plaintiff's inconsistent statements regarding how frequently he uses a cane, his admission to using it infrequently, that the cane was

not prescribed to him, and that plaintiff did not use a cane at the hearing. (Tr. 18–19, 22) As the ALJ explained, plaintiff was also reported at various medical appointments to have required no more than "minimal medical care" for his arthritis, including appointments that note no arthritis symptoms and many appointments where plaintiff was not prescribed any medication. (Tr. 20) Plaintiff also demonstrated "symptom magnification" when evaluated, according to the ALJ. *Id.* Finally, the ALJ noted the CDI report of plaintiff loading a refrigerator onto a truck by himself—an activity inconsistent with plaintiff's reports that his left leg cannot even support his own weight without a cane—and plaintiff using his cane on the wrong side for a condition of his left leg. (Tr. 20–21)

It was therefore proper for the ALJ to discount plaintiff's inconsistent, subjective reports of needing a cane to ambulate as well as Dr. Francis's opinion with regard to the frequency with which plaintiff might need to use a cane. *See Smith v. Colvin*, 756 F.3d 621, 625 (8th Cir. 2014) (explaining that a court is to "defer to the ALJ's evaluation of [a claimant's] credibility, provided that such determination is supported by good reasons and substantial evidence, even if every factor is not discussed in depth" (internal quotation marks and citation omitted)); *Goff*, 421 F.3d at 790–91 ("[A]n appropriate finding of inconsistency with other evidence alone is sufficient to discount [an] opinion."). Thus, in formulating the RFC, the ALJ did not err by failing to include the above restrictions on ambulation.

## VI. <u>Conclusion</u>

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole. Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 13th day of March, 2015.